[No. H036621. Sixth Dist. Jan. 10, 2012.]

In re the Marriage of ELENA M. and RALPH D. WALKER.
ELENA M. WALKER, Respondent, v.
RALPH D. WALKER, Appellant.

COUNSEL

Robert M. Allen Law Offices and Robert M. Allen for Appellant.

Brent N. Ventura Law Offices and Brent N. Ventura for Respondent.

OPINION

**MIHARA, Acting P. J.**—Appellant Ralph D. Walker (Ralph) appeals from the family court's 2010 orders (1) denying his motion to set aside under Family Code section 2122 the court's 2009 orders awarding to respondent Elena M. Walker (Elena), his former spouse, a community property interest in his California State Teachers' Retirement System (CalSTRS) disability allowance, (2) denying his motion for an employment efforts order against Elena, and (3) denying his motion for release to him of $5,000 from a trust account so that he would be able to hire an attorney to challenge the court's order concerning his visitation with the couple's children.

Ralph's challenge to the family court's denial of his motion to set aside the 2009 orders has merit. Elena received her full community property share of Ralph's CalSTRS *retirement* benefits, and, as a matter of law, she had no community property interest in his postseparation *disability allowance*. We reverse the family court's denial of Ralph's motion to set aside the 2009 orders with respect to Ralph's disability allowance. We decline to address his other contentions because they may be affected by our reversal of the court's denial of his motion to set aside the 2009 orders.

## I. Background

Ralph and Elena married in 1993 and have two minor children. They separated in January 2008, and, in March 2008, Elena filed a petition for legal separation. Ralph was 47 years old at the time of their separation. He had worked as a public school teacher until January 2008, when he left his employment due to a disability. Ralph has been a member of CalSTRS since 1986, and he had just under 20 years of CalSTRS service credit when he left his employment. Elena sought and obtained a domestic violence restraining order and a court order restricting Ralph to supervised visitation with the couple's children. In June 2008, Ralph was ordered to pay $1,191 per month in child support and $601 per month in temporary spousal support. In November 2008, the court ordered that therapeutic visitation be substituted for the previously ordered supervised visitation. In January 2009, Elena joined CalSTRS as a party to this action. CalSTRS thereafter notified the

parties that "a legal hold" had been placed on Ralph's CalSTRS account until this matter was resolved.

Proceeds from the sale of the couple's home were placed in a trust account. In June 2009, the court ordered that $4,000 of Ralph's share of the trust account be distributed to Ralph and that additional funds from Ralph's share of the trust account be released to pay for the elder child's "education related activities" and to pay Elena "all past due child and spousal support arrears through and including March 11, 2009." At the same time, the court modified child support to $1,000 per month and temporarily suspended Ralph's obligation to pay spousal support to Elena.

Ralph had applied for a CalSTRS disability allowance after the couple separated, and CalSTRS granted his application retroactive to December 2008. However, because his CalSTRS account remained on hold, he did not receive any disability allowance payments. On June 26, 2009, CalSTRS sent a letter to Elena's attorney regarding Ralph's CalSTRS benefits. This letter set forth calculations based on application of "the time rule formula" to determine the share of a "former spouse" in Ralph's disability allowance. CalSTRS's calculations indicated that the "former spouse['s]" share would be 36.22 percent of the monthly disability allowance, which would amount to $1,838 per month. CalSTRS also stated: "[T]he segregation method of division . . . may be used to divide the community interest at this time. Once the member begins receiving a benefit, the segregation method will no longer be an acceptable method of division. The member's segregation estimates do not reflect the member's disability allowance, nor will the member's disability benefit be impacted. However, should the member later apply for Service Retirement (SR), the amount of service credit used to calculate the SR benefit will be reduced; and therefore, the Disability estimates enclosed that show the DA to SR conversion will also be affected." Elena's segregated nonmember spouse CalSTRS account, which would contain her community property share of Ralph's service credits, contributions, and interest, would not be used to fund any part of Ralph's disability allowance.

In August 2009, the court entered a "STIPULATION AND ORDER" under which the parties agreed to "enter into a Domestic Relations Order (DRO) regarding Respondent's right to receive disability benefits from CalSTRS. Said stipulation will provide that Petitioner will receive her one-half (1/2) share of the community property interest in Respondent's CalSTRS disability benefits as calculated by CalSTRS and said payments will be sent directly to Petitioner, the remainder shall be paid directly to Respondent. The parties agree to retain Catherine Wiehe, Esq., to prepare said DRO and to equally

pay her fees and costs from their share of the sums held in the attorney-client trust account." The order also provided for the release of $8,000 from the trust account to Ralph in exchange for his agreement that "the first $13,000" of "the lump sum retroactive disability benefits payable to him from CalSTRS" would be paid to Elena. Elena was to transfer $8,000 of the $13,000 back into the trust account and would retain the remaining $5,000 for past and future child support. "The remaining portion of said retroactive disability benefits payable in lump sum by CalSTRS shall be distributed to Petitioner pursuant to her one-half community property interest as calculated by CalSTRS, and the remainder to Respondent." "Thereafter, the monthly, current, ongoing disability benefits shall be paid to Petitioner directly, for her one-half community property interest in said benefits in the amount as calculated by CalSTRS, and the remainder of said benefits shall be paid directly to Respondent." "The parties also agree to enter into another Domestic Relations Order (DRO) to divide Respondent's, Ralph Walker's CalSTRS pension benefits to provide Petitioner with her one-half (1/2) share of the community property interest in Respondent's CalSTRS pension as calculated by CalSTRS. The parties agree to retain Catherine Wiehe, Esq. to prepare said DRO . . . ."

Wiehe subsequently obtained additional information from CalSTRS. CalSTRS stated that Ralph did not have a " 'disability' account"; "[a] Disability benefit is merely a benefit as a result of contributing to the Defined Benefit account as a full time member of CalSTRS." CalSTRS advised: "While it is not typical that we not only segregate the community interest and [also] pay a former spouse a portion of the member's remaining benefit(s), we do understand that this may be a means to obtain other monies owed for whatever reason."

Wiehe prepared a domestic relations order (DRO), and the court issued the DRO as a "STIPULATION AND ORDER" on September 3, 2009. Both Ralph and Elena stipulated in writing to this DRO. The DRO provided that it "shall be controlling regarding the definition and payment of [Elena's] interest in [Ralph's] CalSTRS Defined Benefit Account, Defined Benefit Supplemental Account and Cash Balance Account through the CalSTRS." CalSTRS was ordered to use the " 'Segregation Method' " to divide the community portion of these accounts into individual accounts for Elena and Ralph. In addition, the DRO provided that Elena "shall receive 36.22%" of any "disability benefits" that Ralph was "awarded" by CalSTRS. The DRO stated: "The parties understand that this [36.22 percent] results in an approximately $1,838 monthly disability benefit payment to [Elena]." The DRO also

repeated the language from the earlier order regarding the distribution of the first $13,000 in lump sum retroactive disability payments.

In August 2010, Ralph obtained a new "(limited scope)" attorney and filed a motion to (1) "Set Aside" the August 2009 and September 2009 orders, (2) obtain additional funds from the trust account, and (3) have the court issue an "Employment Efforts Order" against Elena.

Ralph claimed that the 2009 orders had been obtained "due to mistake (F.C. Section 2122(e)) or fraud (F.C. Section 2122(a))" because he had wrongly believed and "assumed," based ·on the June 2009 CalSTRS letter and representations by Elena's attorney and Wiehe, that Elena had a community property interest in his CalSTRS disability allowance when in fact his disability allowance was his separate property. Ralph claimed that he had not learned the truth until his new attorney told him so in July 2010.

Ralph declared that there was $64,000 in "undivided community property" in the trust account. He sought $5,000 from this account to pay to his current "limited scope" attorney to expand his scope to include seeking modification of the child visitation order and the restraining order, and $3,900 from this account to pay a psychotherapist for 30 hours of treatment "designed to address the issues that have interfered with my ability to have a normal father-child visitation and relationship with our children."

In September 2010, Elena filed a motion to (1) modify child support and spousal support, (2) obtain attorney's fees and costs of $2,540 from Ralph, and (3) transfer Ralph's share of the community funds in the trust account (approximately $20,000) into a child support security account. Ralph had not paid any child support since March 2009, and he had also not paid the education-related expenses he had been ordered to pay.

Elena also responded to Ralph's motions. Her attorney declared that Ralph and his prior attorney had agreed to the division of Ralph's disability benefits because CalSTRS had informed them that it would otherwise continue its "hold" on Ralph's account until all community property issues regarding all of his CalSTRS benefits had been resolved. He asserted that CalSTRS had stated that Ralph's disability benefits were not "separate" from his other CalSTRS benefits, depended upon his contributions to his defined benefit account, and were being paid out of his defined benefit account, in which Elena had a community property interest. CalSTRS had also stated: "The benefit payable from CalSTRS is being paid directly out of the contributions

made by the member and his employer while the member was working as a teacher . . . ." Elena explained that she was unable to seek full-time employment because she homeschooled one of their children due to his learning disability. Elena did work part time at home as a tutor for other children.

In reply to Elena's response regarding his request for an employment efforts order, Ralph argued that their elder child, whom Elena was home-schooling, should attend public school so that Elena could be employed full time.

The court issued an order addressing both Ralph's motions and Elena's motions. The court denied Ralph's motion to set aside the 2009 orders. It found that his CalSTRS disability benefits were not his separate property. The court also questioned whether Family Code section 2122 could even be utilized here since this was an "order" rather than a "judgment." The court found that there "was no mistake" because Elena had a community property interest in Ralph's disability allowance. In the court's view, Ralph's disability allowance was "a service-connected disability pension which is meant to replace his retirement pension." "[T]he disability benefits are being paid in lieu of a longevity pension . . . ."

The court also denied Ralph's requests for funds from the trust account. Because the funds in the trust account "are the only appreciable asset remaining in this case, the Court intends to preserve these funds until issues of reimbursement and support arrearages are determined." The court concluded that Ralph's request for funds for psychotherapy would be more properly addressed in connection with a motion to modify visitation, which Ralph had not filed. The court denied Ralph's request for an employment efforts order because "I honestly didn't feel that I had enough information regarding the basis" for that request. The court reserved ruling on Elena's request for attorney's fees and costs and denied her other motions. Ralph timely filed a notice of appeal from the court's January 2011 order.[1]

## II. Discussion

### A. Disability Allowance

Ralph contends that the family court abused its discretion in denying his motion to set aside the 2009 orders with respect to his disability allowance.

---

[1] Elena argues that Ralph's appeal is untimely because he failed to file a timely appeal from the 2009 orders. Ralph is not challenging the 2009 orders themselves. Instead, he has filed a timely appeal from the family court's denial of his timely motion to set aside those orders under Family Code section 2122. This appeal is properly before us.

The family court denied his motion on the ground that there "was no mistake" because Ralph's disability allowance was "a service-connected disability pension which is meant to replace his retirement pension" and was "being paid in lieu of a longevity pension"; therefore Elena had a community property interest in it. Ralph asserts that, as a matter of law, his CalSTRS disability allowance was his postseparation separate property income. Elena insists that the family court's ruling was correct.[2]

### 1.  Standard of Review

A party may move to set aside a "stipulated" family court judgment "or any part or parts thereof" on the grounds of "mistake, either mutual or unilateral, whether mistake of law or mistake of fact" so long as the motion is "brought within one year after the date of entry of judgment."[3] (Fam. Code, § 2122, subd. (e).) "[B]efore granting relief, the court shall find that the facts alleged as the grounds for relief materially affected the original outcome and that the moving party would materially benefit from the granting of the relief." (Fam. Code, § 2121, subd. (b).) We review the family court's ruling for abuse of discretion. (*In re Marriage of Brewer & Federici* (2001) 93 Cal.App.4th 1334, 1346 [113 Cal.Rptr.2d 849].)

Although Elena argues on appeal that Ralph may not materially benefit from an order vacating the 2009 orders, the family court never considered that issue because it found that Ralph had not made a mistake.[4] Because the family court's ruling was premised on its finding of no mistake, that is the finding that we must review.

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [76 Cal.Rptr.3d 250, 182 P.3d 579], fns. omitted.)

---

[2] Elena repeatedly mischaracterizes Ralph's disability allowance as "a CalSTRS Disability *Retirement* Allowance." (Italics added.) The record consistently characterizes Ralph's disability allowance as a CalSTRS "disability allowance," not a CalSTRS "disability retirement allowance." As we point out, *post*, the two types of CalSTRS allowances are not the same.

[3] The family court expressed the belief that the 2009 "orders" were not subject to Family Code section 2122 because they were orders rather than judgments. Elena does not defend the family court's belief on appeal, and she concedes that the 2009 orders were "equivalent to a final Judgment . . . ."

[4] Elena's claim is doubtful. While Ralph's income for child support and spousal support purposes will rise if his disability allowance is characterized as his separate property, his obligation to pay child support will terminate when his 12-year-old and 16-year-old sons reach adulthood, while his disability allowance may continue well beyond that point in time.

The family court did not resolve any factual disputes in making its ruling on Ralph's motion to vacate. Its ruling was based solely on its legal conclusion that Elena had a community property interest in Ralph's CalSTRS disability allowance. We exercise de novo review over this legal conclusion.

## 2. CalSTRS Provisions

The statutes governing CalSTRS appear in title 1, division 1, part 13 of the Education Code. Chapter 25 of part 13 governs disability allowances, while chapter 26 governs disability retirement, and chapter 27 governs service retirement. Although both a disability allowance and disability retirement are " '[d]isability benefit[s]' " provided by CalSTRS to its members (Ed. Code, § 22127.2), the two benefits are not synonymous.[5] One obvious difference between the two is that a disability retirement allowance is paid only to a member who has retired, while a disability allowance may be paid to a member who has not retired. Another difference is in the calculation of the amount of the allowance.

A CalSTRS member who becomes disabled may apply for a disability allowance if the member has at least five years of service credit and has not attained the "normal retirement age" of 60 years old. (Ed. Code, § 24001; see *id.*, § 24002, subd. (b).) The amount of the disability allowance is not necessarily dependent on the member's years of service because the amount of the disability allowance is the *lesser* of the amounts produced by two different calculation methods. (Ed. Code, § 24007 ["The disabled member shall receive the lesser of this amount [calculated under Education Code section 24007] or the amount provided by Section 24006."].) One method takes into account the member's years of service. (Ed. Code, § 24007 [member who is at least 45 years old and not yet 60 years old may have allowance "calculated upon service with each year of credited California service providing 5 percent of final compensation"].)[6] The other method is not based on the member's years of service. (Ed. Code, § 24006 ["member shall receive an annual allowance equal to 50 percent of final compensation payable in monthly installments" plus "10 percent of final compensation for

---

[5] They are similar in one respect. The "Defined Benefit Supplemental Plan" provides supplemental benefits for CalSTRS members, including a "disability benefit" which supplements either a disability retirement allowance or a disability allowance. (Ed. Code, §§ 25000, 25017.)

[6] There is one narrow exception. "This section shall not apply to a member who is eligible to apply for a disability allowance under subdivision (c) of Section 24001." (Ed. Code, § 24007.) Education Code section 24001, subdivision (c) applies where a member has fewer than five years of service but was rendered disabled as a result of an unlawful act of bodily injury while on duty. (Ed. Code, § 24001, subd. (c).)

each dependent child, to a maximum of four dependent children"].) The result is that a member with 20 years of service, such as Ralph, will not receive a disability allowance based on his years of service (which would have yielded 100 percent of final compensation), but will instead receive the lesser amount of 70 percent of final compensation (50 percent plus 20 percent for his two dependent children). Ralph's disability allowance was calculated using the latter method, which was not based on his years of service. When a member who is receiving a disability allowance reaches normal retirement age, the disability allowance ordinarily terminates, and the member is eligible for a service retirement. (Ed. Code, § 24213, subd. (a).)

A disability *retirement* allowance, on the other hand, is *never* based on years of service. "Upon retirement for disability pursuant to this chapter, a member under this part shall receive a retirement allowance that shall consist of all of the following: [¶] (a) An annual allowance equal to 50 percent of final compensation payable in monthly installments. [¶] (b) An additional 10 percent of final compensation for each dependent child, up to a maximum of 40 percent of final compensation. . . . [¶] (c) An annuity that shall be the actuarial equivalent of the accumulated annuity deposit contributions standing to the credit of the member's account on the effective date of the disability retirement." (Ed. Code, § 24106.) A member with fewer years of service than Ralph or with more dependent children could receive a larger amount as a disability retirement allowance than the member would be eligible to receive as a disability allowance.

██ Both of these disability benefits are distinguishable from a CalSTRS "service retirement." A CalSTRS service retirement is not available until the member is 55 years of age or older. (Ed. Code, § 24201, subd. (a)(1).) If a member retires at age 60, the normal retirement age, the member receives an allowance equal to 2 percent times the number of years of service times final compensation. (Ed. Code, § 24202.) If the member retires at 55 years of age but less than 60 years of age (early retirement), the member receives a reduced service retirement allowance, also based on years of service. (Ed. Code, §§ 22128, 22148.)

██ The CalSTRS statutes explicitly provide for the division of a community property interest in a CalSTRS member's "retirement allowance or retirement benefit." (Ed. Code, § 22655.) There are no parallel provisions providing for division of a member's "disability allowance." Instead, the only role that a disability allowance plays with respect to a nonmember spouse's community property interest in a member's CalSTRS benefits is where the disability allowance commenced *prior to* the couple's separation. (Ed. Code, § 22664, subd. (e) [limit on nonmember spouse's right to retire where

member spouse was receiving a disability allowance on the date of separation; nonmember spouse cannot retire until disability allowance terminates].) Here, Ralph's disability allowance commenced *after* the couple's separation, so it has no impact on Elena's community property interest in Ralph's CalSTRS *retirement* benefits.

### 3. Case Authority

█ The seminal cases in this arena are a trio of cases concerning military disability pay. The first of these cases was the California Supreme Court's decision in *In re Marriage of Jones* (1975) 13 Cal.3d 457 [119 Cal.Rptr. 108, 531 P.2d 420] (*Jones*), disapproved on "nonvested" issue in *In re Marriage of Brown* (1976) 15 Cal.3d 838, 851, footnote 13 [126 Cal.Rptr. 633, 544 P.2d 561]. Although the court found in *Jones* that "under California community property law vested retirement benefits, attributable to employment during marriage, constitute a community asset subject to division upon dissolution," it concluded that "disability pay" should be treated differently. (*Jones*, at pp. 461–462.) "Disability pay, however, does not serve primarily as a form of deferred compensation for past services. Although longevity of service plays a role, the [disabled spouse's] right to disability payments, and the amount of the payments, depend primarily on the existence and extent of the disability. Such payments serve to compensate the disabled [spouse] for the loss of . . . pay caused by his premature retirement . . . ." "So long as the marriage subsists, the [disabled spouse's] reduced earnings works a loss to the community. But such community loss does not continue after dissolution; at that point the earnings or accumulations of each party are the separate property of such party. (Civ. Code, § 5119.) Then any diminution in earning capacity becomes the separate loss of the disabled spouse." (*Jones*, at p. 462.) The California Supreme Court held that the disabled spouse's military disability *retirement* pay after separation was his separate property. (*Jones*, at pp. 459, 461–462.)

█ In *In re Marriage of Mueller* (1977) 70 Cal.App.3d 66 [137 Cal.Rptr. 129] (*Mueller*), the disabled spouse was eligible for military service retirement at the time that he elected a military disability retirement, which had a tax advantage. (*Mueller*, at p. 69.) The Fourth District Court of Appeal distinguished *Jones*. "[W]here the employee spouse elects to receive disability benefits in lieu of a matured right to retirement benefits, only the net amount thus received over and above what would have been received as retirement benefits constitutes compensation for personal anguish and loss of earning capacity and is, thus, the employee spouse's separate property. The amount received in lieu of matured retirement benefits remains *community* property subject to division on dissolution." (*Mueller*, at p. 71.)

■ The California Supreme Court revisited this issue and partially overruled *Jones* in *In re Marriage of Stenquist* (1978) 21 Cal.3d 779, 785–787 [148 Cal.Rptr. 9, 582 P.2d 96] (*Stenquist*). In *Stenquist*, the disabled spouse, who was eligible for a military *service* retirement, elected to take a more remunerative military *disability* retirement. (*Stenquist*, at p. 783.) The vast majority of the disabled spouse's years of military service had occurred during the marriage, and the California Supreme Court found that the community had an interest in the disabled spouse's disability retirement because otherwise the disabled spouse's "election" to take a disability retirement rather than a service retirement would "defeat the community interest of the other spouse." (*Stenquist*, at p. 786.) The court noted that the amount of the disability retirement was computed based in part on the disabled spouse's years of service, and concluded that "the [disability] pension's function of compensating the [disabled spouse] for loss of earning capacity or providing recompense for personal suffering is secondary to the primary objective of providing retirement support." (*Stenquist*, at p. 787.)

Following that trio of cases, other cases have addressed related issues in a variety of circumstances.

In *In re Marriage of Briltz* (1983) 141 Cal.App.3d 17 [189 Cal.Rptr. 893] (*Briltz*), the husband became eligible for early retirement at age 55 under his union's pension plan. Five years later, the couple separated. Three years after separation, the husband became disabled and began receiving disability benefits, which were less than his early retirement benefits would have been. The wife claimed a community property interest in the husband's disability benefits. (*Briltz*, at pp. 18–19.) Citing *Stenquist*, the First District Court of Appeal held that the husband's disability benefits were in lieu of retirement and therefore the wife had a community property interest in those benefits. (*Briltz*, at pp. 20–21.)

■ In *In re Marriage of Justice* (1984) 157 Cal.App.3d 82 [204 Cal.Rptr. 6] (*Justice*), the wife had been awarded half of the husband's service pension as her community property share. A year after the dissolution, and two months before he would have become eligible for the service pension, he was granted a disability pension. (*Justice*, at pp. 84–85.) He insisted that she was entitled to none of it because it was a disability pension rather than a service pension. (*Justice*, at p. 85.) The Second District Court of Appeal reasoned that, although the husband was still two months short of becoming eligible for a service pension and therefore was not actually choosing between a service pension and a disability pension at the time he received the disability pension, the dispositive issue was whether the primary function of the disability pension was to compensate for lost earnings or to replace retirement pay. (*Justice*, at pp. 88–89.) Because the predominant function of the

husband's disability pension was to "replace service retirement benefits," the disability pension was community property except to the extent that it exceeded the service pension for which the husband was eligible. (*Justice*, at p. 89.)

■ In *In re Marriage of Saslow* (1985) 40 Cal.3d 848 [221 Cal.Rptr. 546, 710 P.2d 346] (*Saslow*), a private disability insurance policy was purchased during the marriage with community funds. The husband became disabled during the marriage and began receiving benefits from the policy. The issue was whether the husband's postseparation disability benefits were community property or his separate property. (*Saslow*, at p. 854.) The court did not consider it dispositive that the policy had been purchased with entirely community funds. (*Saslow*, at p. 860.) Instead, it concluded that *Stenquist* provided the correct test for resolving the issue. "The approach taken by this court in *Stenquist* provides for the most equitable distribution of disability insurance benefits. This approach requires that the trial court treat disability benefits as separate property insofar as they are intended to replace postdissolution earnings that would have been the separate-property income of the disabled spouse, and treat the benefits as community property insofar as they are intended to provide retirement income." (*Saslow*, at pp. 860–861.)

In *In re Marriage of Elfmont* (1995) 9 Cal.4th 1026 [39 Cal.Rptr.2d 590, 891 P.2d 136] (*Elfmont*), community funds were used during the marriage to pay premiums on the husband's multiple private disability insurance policies. After separation, the husband continued paying premiums on the policies using his separate property. A couple of years after separation, the husband became disabled and began receiving benefits from the disability insurance policies. (*Elfmont*, at pp. 1029–1030.) The trial court concluded, under *Saslow*, that some of the policies were intended to provide retirement income, while others of the policies were intended to replace the husband's earnings, and it characterized the former as community and the latter as the husband's separate property. (*Elfmont*, at p. 1031.) The husband challenged that ruling. (*Ibid.*)

The California Supreme Court held that the postseparation benefits were the husband's separate property. "The purpose of term disability insurance . . . is to replace lost earnings. If during the marriage an insured spouse becomes disabled, the benefits received are community property because they replace community earnings. [Citation.] If the benefits continue after the spouses have separated, they are the separate property of the insured spouse whose earnings they replace, unless during the marriage the premiums were paid out of community funds with the intent that the benefits provide retirement income. [Citation.] If, however, the insured spouse has not become disabled during the last policy term for which a premium was paid before the

parties' separation, the community will have no interest in benefits produced by renewals of the policy for subsequent terms, because the renewal premium will not have been paid 'during the marriage with community funds' and with the intent of providing community retirement income [citation]." (*Elfmont, supra,* 9 Cal.4th at pp. 1034–1035.)

### 4. Characterization of Ralph's Disability Allowance

" 'Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding.' [Citations.] [¶] But de novo review is appropriate where resolution of 'the issue of the characterization to be given (as separate or community property) . . . requires a critical consideration, in a factual context, of legal principles and their underlying values, [such that] the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law.' " (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734 [91 Cal.Rptr.3d 427] (*Rossin*).)[7]

The resolution of the characterization issue in this case is a mixed question of fact and law that is predominantly one of law and as to which the facts are not disputed. This is not a case like *Mueller, Stenquist, Justice,* or *Briltz,* where the disabled spouse *elected* to receive a disability pension *in lieu of* a service pension. Instead, as in *Saslow* and *Elfmont,* Ralph's disability allowance replaces his lost earnings during the period of postseparation, preretirement disability. Elena has not been deprived of her community property share of Ralph's service retirement by Ralph's receipt of a CalSTRS disability allowance. She received her entire community property share of Ralph's *service retirement* when the DRO ordered CalSTRS to place her community property share of Ralph's *service* retirement (service credits, contributions, and interest) into a separate nonmember CalSTRS account, over which she has independent control.[8] Ralph did not *elect* to receive a

---

[7] In *Rossin, supra,* 172 Cal.App.4th 725, this court found that, where the right to disability benefits accrued prior to the marriage (a disability policy was purchased with separate property funds prior to marriage, and the purchasing party became disabled and began receiving benefits prior to marriage), the disability benefits were the disabled spouse's separate property. (*Rossin,* at p. 735.) Because the disabled spouse's right to the benefits was acquired prior to the marriage, this court did not consider whether the benefits functioned as a wage substitute or a pension substitute. (*Ibid.*)

[8] The parties devote considerable attention to the details of how CalSTRS funds Ralph's disability allowance. Elena's community property share of Ralph's CalSTRS retirement was segregated into a separate nonmember CalSTRS account *before* CalSTRS began paying Ralph his disability allowance. Elena's nonmember CalSTRS account was not utilized in any way to fund Ralph's disability allowance. Hence, CalSTRS's method of funding Ralph's disability allowance is irrelevant. Elena will be eligible to access her share of Ralph's service retirement when *she* reaches the age of 55. (Ed. Code, § 22664, subd. (a)(3).)

disability allowance *in lieu of* a service retirement. He was not eligible for a service retirement at the time he became disabled, and his disability allowance will terminate when he becomes eligible for a service retirement, if not sooner if he ceases to remain disabled. Under these undisputed facts, Ralph's disability allowance cannot be deemed to provide retirement income but can only be properly seen as replacing his lost earnings during the period of his preretirement disability. The family court erred as a matter of law in concluding that Ralph had made "no mistake" in agreeing that Elena had a community property interest in his disability allowance. Accordingly, the family court should not have denied his motion to set aside the 2009 orders as to his disability allowance on this basis.

## B. Ralph's Other Contentions

Ralph also contends that the family court should have (1) granted his motion for release to him of $5,000 from the trust fund to allow him to obtain an attorney to litigate visitation issues, and (2) issued an employment efforts order against Elena. Because both of these contentions concern financial issues that may be impacted by our reversal of the family court's order on Ralph's motion to vacate, it would be premature for us to address them. If Ralph wishes to pursue these issues after the family court vacates its order denying his motion to set aside, nothing precludes him from doing so.

Finally, Ralph asks this court to order that "in the interests of justice" this matter be assigned to a different judge on remand. (Code Civ. Proc., § 170.1, subd. (c).) He contends that the trial judge's ruling regarding his disability allowance was illogical and inequitable, demonstrated that she was "too closed minded to understand" the correct principle to apply, and showed that she was more intent on expeditiousness than on "dispensing justice." He claims, on this basis, that the trial judge has demonstrated "actual bias" or "at least . . . a strong appearance of said bias" against him.

We disagree. Our power to direct that a different judge hear the matter on remand should be "used sparingly and only where the interests of justice require it." (*People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562 [258 Cal.Rptr. 75].) The fact that the trial judge made a legal error in characterizing Ralph's disability allowance does not itself create the appearance of bias, much less establish bias, and our review of the entire record finds nothing to suggest that the trial judge is biased against Ralph. Consequently, we decline to order that this matter be heard before a different judge on remand.

## III. Disposition

The family court's order denying Ralph's motion to vacate the 2009 orders with respect to Elena's interest in his disability allowance is reversed. Ralph shall recover his appellate costs.

Duffy, J.,[*] and Walsh, J.,[†] concurred.

A petition for a rehearing was denied February 2, 2012.

---

[*]Retired Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†]Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.