Filed 1/8/24  Maki v. Studio S CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| IZUMI MAKI, | B319444 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC701154) |
| v. | |
| STUDIO S, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

A. Liberatore and Anthony A. Liberatore; Jones & Bendon and H.W. Trey Jones; The Arkin Law Firm and Sharon J. Arkin, for Plaintiff and Appellant.

Law Offices of Kirk & Myers and Jeffrey Cabot Myers, for Defendant and Respondent.

# I.    INTRODUCTION

After plaintiff Izumi Maki broke her foot at a sample sale, she sued defendant Studio S, Inc. (defendant) for negligence and premises liability.  The jury awarded plaintiff $3.5 million in damages, but the trial court granted defendant's motion for a partial new trial, pursuant to Code of Civil Procedure[1] 657, finding that insufficient evidence supported the jury's apportionment of fault and the damages award was excessive.  Plaintiff appeals from the new trial order.  We affirm.

# II.    BACKGROUND

A.    *Trial Proceedings*[2]

On June 29, 2016, plaintiff, her friends Masami Sakakura and Elizabeth LeGlaire, and LeGlaire's daughter attended a sample sale of dresses designed by Sue Wong.[3]  The sample sale took place on the second floor of a warehouse located at 3030

---

[1]    Further statutory references are to the Code of Civil Procedure.

[2]    We set forth the facts in the light most favorable to the trial court's order.  (See *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229.)

[3]    Plaintiff initially filed her complaint against Sue L. Wong, Sue Wong Lifestyle, Inc., and Sue Wong Universe LP.  The parties later stipulated that defendant would stand in the place of the initially named defendants, who were then dismissed from the lawsuit.

West 6th Street, Los Angeles, that was owned, occupied, and controlled by defendant. Wong greeted plaintiff and Sakakura upon their arrival.[4] She then retreated to her studio to work.

The sample sale had racks of clothing, including those in the hallway that led to Wong's studio. As the three women and LeGlaire's daughter viewed and tried on dresses, they left their purses on a sofa in a "celebrity showroom," located 75 feet from Wong's studio. At some point, the door to the celebrity showroom became closed and locked, with the women's purses and telephones inside.

The women asked two employees of defendant for a key to the locked door but received no response.[5] They also asked the employees to call a locksmith but again received no response. Plaintiff, who had a dinner appointment that evening, became stressed and "very nervous."

When plaintiff noticed that two of the walls of the celebrity showroom did not reach the top of the ceiling, she said, "[I]f I got up there[,] I could just jump over and land on the couch." One of defendant's employees brought out a ladder.[6] Plaintiff initially

---

[4]     LeGlaire and her daughter arrived at the sample sale approximately an hour later.

[5]     Wong testified that defendant had not had a key to the showroom since 2007. Wong also testified that if plaintiff and her friends had contacted her about the issue, Wong would have called a locksmith.

[6]     There was conflicting testimony about who requested a ladder. According to LeGlaire, defendant's employee brought a ladder after plaintiff's comment. Plaintiff admitted during cross-examination that she asked for the ladder.

asked an employee to climb up the ladder, but when the employee refused, plaintiff said, "'I'll climb over myself.'" Plaintiff, who was 57 years old at the time of the incident, was an avid "exercise person" and "want[ed] to prove it."

LeGlaire told plaintiff that "it was a bad idea" for her to climb up the ladder. Plaintiff nonetheless ascended the ladder, crossed over the top of the wall, and then fell, breaking her left heel. Plaintiff had to crawl on the floor to the locked door, which she opened.

The women then completed their shopping and paid for their purchases. LeGlaire carried plaintiff down the stairs and into her car. Sakakura drove plaintiff home.

On the night of her injury, plaintiff asked Dr. Steven Schwartz, plaintiff's former boyfriend and neighbor, to look at her foot. Dr. Schwartz placed the foot in an emergency wrap and examined plaintiff the following day in his office.[7] Dr. Schwartz took x-rays of plaintiff's left foot and placed it in a restrictive boot.

In September 2016, Dr. Schwartz referred plaintiff to a physical therapist. After four visits, plaintiff took a break and did not attend therapy for nine months.

In October 2016, Dr. Schwartz gave plaintiff a cortisone shot to reduce inflammation. A cortisone shot is typically effective for two to four weeks.

In November 2016, plaintiff was examined by Dr. Phillip Kwong, an orthopedic surgeon who specialized in the foot and

---

[7] Plaintiff testified that Dr. Schwartz made an appointment for plaintiff to see a different doctor, Dr. Charles Moon. Plaintiff saw Dr. Moon the day after the accident but Dr. Moon did not testify at trial.

4

ankle.  Because plaintiff's injury had begun to heal by that time, Dr. Kwong initially decided to treat plaintiff without surgery, using a custom orthotic that would be inserted in plaintiff's shoe.  Dr. Kwong also administered a cortisone shot as a temporary treatment and prescribed physical therapy.

In January 2018, plaintiff reported to her physical therapist that she could walk with her dogs with "'no pain.'"  On February 16, 2018, plaintiff told her physical therapist that she "'[h]iked with both dogs at Runyon Canyon (the Tough Trail) without complaints.'"  Plaintiff reported to Dr. Kwong that after 24 sessions, she discontinued physical therapy because "it didn't help anymore."  Plaintiff did not receive treatment from March until August 2018.

Dr. Kwong recommended that plaintiff continue to wear the orthotic to alleviate her pain, but, during an examination in September 2020, plaintiff told Dr. Kwong that she was no longer wearing the orthotic.

Dr. Kwong eventually recommended that plaintiff undergo surgery.  The surgery would be a "partial correction," and would lessen plaintiff's pain.  Plaintiff had previously undergone three elective surgeries.  She was thus aware of the risks involved in surgery and intended to have the recommended surgery.  She had not had the surgery at the time of trial because she helped care for her elderly mother who lived in Japan.  If her mother were to pass away, plaintiff would have to travel to Japan for the funeral.

Plaintiff regularly smoked cigarettes, which, in Dr. Kwong's opinion, could interfere with bone healing.

5

Dr. J. Scott Rosenthal, a podiatrist, examined plaintiff at defendant's request.[8] During the examination, plaintiff got up to go the restroom, and when she did so she "actually jumped out of the chair, landed on her left heel, didn't complain, and walked to the bathroom." In Dr. Rosenthal's opinion, treatment and physical therapy have allowed plaintiff to return to full weightbearing activity.

B.    *Jury Verdict*

On October 5, 2021, the jury returned its verdict. It found that defendant was negligent and its negligence was a substantial factor in causing plaintiff harm. The jury determined that plaintiff's own negligence also was a substantial factor in causing her harm. Regarding comparative fault, the jury concluded that plaintiff and defendant were each 50 percent at fault for plaintiff's injuries.

For the premises negligence claim, the jury concluded that defendant was negligent in maintaining its premises, but such negligence was not a substantial factor in causing plaintiff harm.

For damages, the jury awarded plaintiff $1.5 million for past noneconomic damages and $2 million for future noneconomic damages. Plaintiff did not seek or submit any evidence regarding economic damages.

---

[8]    Plaintiff played video clips from Dr. Rosenthal's deposition during her case-in-chief.

C.      *Order Granting Motion for Partial New Trial*

Following the jury verdict, defendant moved for a partial new trial, on the grounds there was insufficient evidence to support the jury's apportionment of fault between plaintiff and defendant and the damages award was excessive.

On January 28, 2022, the trial court ruled on the motion. First, it considered defendant's argument that insufficient evidence supported the jury's apportionment of fault. After noting that defendant's employee was negligent for bringing over a ladder and plaintiff was negligent for climbing the ladder, the court observed, "This evidence alone justified the jury's 50/50 allocation of responsibility as between [plaintiff and defendant]." The court then continued: "But there was more to consider on the appropriate allocation of fault. In the [c]ourt's view, the jury did not adequately consider [d]efendant's comparative negligence evidence that should have increased [plaintiff's] comparative share of responsibility. [Plaintiff] and her friends saw Wong return to her office after Wong greeted [plaintiff] and [Sakakura]. The office was [in] the hallway that was lined with the sample dresses. The approximate length of the hallway was seventy-five feet . . . and [plaintiff] and her friends likely walked [past] or very near Wong's office when they were looking for dresses to buy and the dresses they eventually bought. [Plaintiff] knew Wong was in her office before the door locked. If [plaintiff] asked for a key and requested a locksmith and received no response at all from one of the 'guys,' [plaintiff] (and her friends) knew Wong was very close, just down the hall from the locked room. Wong would have readily resolved the issue if [plaintiff] asked Wong for help. If [plaintiff] for some reason did not want to talk to Wong, [plaintiff]

7

could have asked one of her friends, probably LeGlaire to talk to Wong.  Or if for some reason, everyone in [plaintiff's] group was reticent to talk with Wong, they could have looked for a phone in one of the four offices (or even in Wong's office) [in] the same hallway to call a locksmith themselves.  A reasonable person in the same circumstances would have found Wong for help or called the locksmith herself, before trying to traverse the very dangerous wall that [plaintiff's] friend warned against climbing.  That was so even if [plaintiff] was in exceptional physical condition.  [¶]  Based on a review of the entire record, the comparative fault allocation by the jury is not supported by the evidence."

As to the amount of damages, the trial court concluded they were excessive, finding as follows:  "Dr. Phillip Kwong[] testified that by the time he saw [plaintiff], four and a half months after the incident, the bones started healing and it was too late for surgery to completely repair the fracture.  Surgery would have been a 'partial correction,' but he still recommended surgery at that time.  The surgery would have helped stabilize [plaintiff's] [heel], reduced much of the pain by minimizing grinding, and would make the foot better align to ground level.  Dr. Kwong recommended surgery then in 2016, and still recommended it at the time of trial, more than five and [a] half years later.  Dr. Kwong said, without surgery, [plaintiff's] pain will likely continue.

"[Plaintiff] plainly sustained non-economic injuries, though even by the accounts of [plaintiff] and the doctors, she was weight bearing within 18 months.  When she was seen by J. Scott Rosenthal . . . , a podiatrist, [plaintiff] reported no problem with pain, and he observed normal [heel] bearing and walking.  Dr.

8

Rosenthal thought even the limited time at physical therapy had allowed [plaintiff] to return to 'full weight bearing activity.' [Plaintiff] was also back to strenuous hiking with her dogs.

"The jury should have considered [plaintiff's] recovery after the first two years in its calculation of past non-economic damages, even without the surgery. There[fore], past and future non-economic damages, should have been substantially less than the jury awarded.

"In addition, [plaintiff] had no demonstrable economic loss. She proved no medical expenses and did not have any loss of earnings. These factors also cut against such a large award of non-economic damages. Nor was there evidence that her pain, suffering and loss of enjoyment of life would continue essentially at a constant level, every day, from the end of trial for the rest of her life. There was no apparent effort by the jury to tailor non-economic losses over time to the actual, credible testimony at trial.

"More importantly, the jury failed fully to consider [defendant's] mitigation defense, which [defendant] proved by a preponderance of the evidence. [Plaintiff] did not follow her doctor's recommended course of physical therapy, which seemed to have measurably helped [plaintiff] recover. In fact, [plaintiff] had no treatment at all for substantial periods of time between 2016 and 2021. Nor did she follow the recommendations to use orthotics which also would have reduced or eliminated pain. A cortisone injection helped [plaintiff] with pain, but there was no evidence that she had more than one injection before trial.[9]

---

9       As discussed, Dr. Schwartz and Dr. Kwong testified that they each gave her at least one cortisone shot.

9

"Nor did [plaintiff] see a specialist immediately after the incident and when she saw one more than four months later, she failed to have the recommended surgery then or even as of the trial. Of course, surgery is often discounted as mitigation because of the risks associated with the surgery and the patient's perceived concerns about the long-term impacts of surgery. Here, though, the credible evidence demonstrated [plaintiff] seemed to have no such concerns. She had three cosmetic surgeries between the injury and trial, which like the surgery recommended by Dr. Kwong, carried risks and potential complications.

"In addition, [plaintiff] candidly admitted she intended to have the recommended surgery. The delay now is related to [plaintiff's] mother, whom she testified is infirm in Japan. [Plaintiff] said she takes care of her mother, even though [plaintiff] lives in Los Angeles. Plaintiff said she is just waiting for her mother to pass away and then she will have the surgery.

"Plaintiff offered no explanation why she could not have had the surgery when it was first recommended in 2016. If she had, the non-economic injuries [plaintiff] claimed would have been substantially less. In the [c]ourt's view, after reweighing the evidence of [p]laintiff's actual injuries, the testimony she and her friends gave about her impairments after the accident, and the testimony of the doctors, the amount of non-economic damages awarded by the jury 'shocks the conscience,' is unreasonable and excessive. A new trial on damages is justified." (Fns. omitted.)

The trial court therefore granted defendant's motion and ordered a new trial on plaintiff's cause of action for negligence,

10

"limited to the amount of damages and the allocation of fault as between [p]laintiff and [d]efendant."

Plaintiff timely appealed.

## III.  DISCUSSION

A.  *Standard of Review*

"The standards for reviewing an order granting a new trial are well settled.  After authorizing trial courts to grant a new trial on the grounds of '[e]xcessive . . . damages' or '[i]nsufficiency of the evidence,' [section 657 provides]:  '[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence . . . or upon the ground of excessive or inadequate damages, . . . *such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons*.'  (Italics added.)  Thus, [our Supreme Court has] held that an order granting a new trial under section 657 'must be sustained on appeal unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.'  [Citation.]  Moreover, '[a]n abuse of discretion cannot be found in cases in which the evidence is in conflict and a verdict for the moving party could have been reached . . . .'  [Citation.]  In other words, 'the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the [new trial] order.'  [Citation.]

"The reason for this deference 'is that the trial court, in ruling on [a new trial] motion, sits . . . as an independent trier of fact.'  [Citation.]  Therefore, the trial court's factual

11

determinations, reflected in its decision to grant the new trial, are entitled to the same deference that an appellate court would ordinarily accord a jury's factual determinations.

"The trial court sits much closer to the evidence than an appellate court. Even the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds. The trial court, therefore, is in the best position to assess the reliability of a jury's verdict and, to this end, the Legislature has granted trial courts broad discretion to order new trials. The only relevant limitation on this discretion is that the trial court must state its reasons for granting the new trial, and there must be substantial evidence in the record to support those reasons. [Citation.]" (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411–412.)

B.      *Apportionment of Fault*

"[T]he 'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss.' [Citations.]" (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314 (*Knight*).) In granting a new trial for insufficiency of the evidence for the jury's apportionment of fault, the trial court is permitted to weigh the evidence and consider the entire record. (§ 657; *Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1159–1160 (*Casella*) ["The court is 'vested with the authority . . . to disbelieve witnesses, reweigh the evidence, and

12

draw reasonable inferences therefrom contrary to those of the trier of fact'"]; *O'Kelly v. Willig Freight Lines* (1977) 66 Cal.App.3d 578, 583 [affirming grant of new trial motion based on insufficiency of the evidence to support jury's verdict that plaintiff was 50 percent at fault].)

Plaintiff contends that the trial court's ruling was based on speculation, that is, "feelings or hunches." We disagree. The evidence at trial supported the court's conclusion that plaintiff was more than 50 percent at fault for her injuries. Plaintiff does not dispute that the evidence at trial supported the court's recitation that plaintiff did not seek help from Wong or look for a telephone.[10] Instead, she asserts that "there is no legal basis for putting the onus *on [plaintiff] or her friends to reach out to Wong to solve the problem*." But the court did not conclude that plaintiff was required as a matter of law to ask for Wong's help. Rather, it concluded that plaintiff bore greater responsibility for

---

[10] Plaintiff asserts that the evidence at trial demonstrated that the women "*asked* if they could use the phone *and the request was refused.*" The record cited in support of this assertion includes plaintiff's testimony that she asked one of the employees to call a locksmith but the employee took no action. When the lawyer then asked, "Did they let you use their phone?" plaintiff responded, "No." Although a reasonable fact finder could have inferred from this testimony that plaintiff asked to use a phone and was refused, a fact finder could also have reasonably concluded that plaintiff did not ask to use a phone and the employee did not independently offer such use. Alternatively, a fact finder could have found plaintiff's testimony on this point not credible. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 ["The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so"].)

13

her injuries relative to defendant because, before exhausting other avenues for assistance, she climbed the ladder and fell over the other side. (See *Knight, supra*, 3 Cal.4th at p. 314.) In our view, given the evidence of plaintiff's conduct, which included failing to seek Wong's help or look for a telephone, and instead scaling a high wall, a reasonable trier of fact could have reached the conclusion that plaintiff was more than 50 percent responsible for her damages.

The majority of plaintiff's arguments challenging the trial court's ruling are, at bottom, disagreements with the court's reasoning in making inferences. For instance, plaintiff argues that "there was zero evidence that any of the offices even *had* phones" and posits that "the women would have been subject to allegations of trespass had they gone marauding through the offices trying to find a phone." Plaintiff's disagreements with the court's inferences do not persuade us that the court erred in granting a new trial on comparative fault. We find no abuse of discretion.

C.    *Excessive Damages*

Plaintiff next challenges the trial court's finding that the jury's damages award was excessive, contending that the court abused its discretion in granting the motion for new trial.

"Determining the amount of money a plaintiff is to be awarded as compensation for noneconomic injuries is '[o]ne of the most difficult tasks imposed on a fact finder.' [Citation.] 'The inquiry is inherently subjective and not easily amenable to concrete measurement.' (*Ibid.*) Naturally, therefore, the appropriate amount of noneconomic damages is "'a matter on

14

which there legitimately may be a wide difference of opinion.""" (*Burchell v. Faculty Physicians & Surgeons of the Loma Linda University School of Medicine* (2020) 54 Cal.App.5th 515, 527 (*Burchell*).)  Additionally, "plaintiffs cannot be compensated for damages that they could have avoided by reasonable effort or expenditure." (*Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 342–343; see also CACI No. 3930 [plaintiff not entitled to recover damages for harm that defendant proves plaintiff could have avoided with reasonable efforts or expenditures].)

Substantial evidence supports the trial court's findings that the jury's award of noneconomic damages was too high and that plaintiff failed to mitigate her damages.  Dr. Rosenthal testified that plaintiff had been able to return to "full weight-bearing activity" within 18 months and plaintiff's physical therapist's notes revealed that plaintiff was able to hike on a difficult trail with no complaint.  The court, which observed the witnesses at trial, found this evidence to be more credible than the testimony of plaintiff and Dr. Kwong on this issue.  Moreover, Dr. Kwong testified that plaintiff did not use her orthotic and the court was entitled to credit his testimony over plaintiff's contrary testimony.

Plaintiff also argues that "the trial court's assertion that the amount of noneconomic losses should be reduced based on a lack of economic damage claims is legally invalid," and cites *Burchell, supra*, 54 Cal.App.5th 515 in support.  That case is inapposite.  The court in *Burchell* held:  "we disagree that we should consider whether there was a 'reasonable relationship' between the award of economic and noneconomic damages here. Without more, the ratio between economic and noneconomic

15

damages that one could calculate from a judgment does not tend to demonstrate that the award of noneconomic damages was unreasonable." (*Id.* at p. 530.)  Here, however, there was no award of economic damages.  And, the trial court did not conclude that the amount, or lack, of economic damages, alone, rendered the noneconomic damages unreasonable.  Rather, the lack of economic damages was one of several factors the court considered in finding that the jury's noneconomic damages award was excessive.  Plaintiff has cited no cases which suggest the court was prohibited, as a matter of law, from considering the lack of economic damages in ruling on the motion, and we have found none.

Again, the majority of plaintiff's arguments regarding the trial court's error in granting the new trial motion on the issue of damages is premised on plaintiff's disagreements with the court's reasoning.  For example, plaintiff disagrees with the court that her ability to hike 18 months after her injury demonstrates that the jury's award was excessive, disputes the court's inference that complying with the doctors' recommended course of physical therapy would have helped plaintiff recover, and argues against the court's conclusion that plaintiff's failure to get surgery demonstrated a failure to mitigate her damages.  As discussed, in considering a motion for new trial, the court may reweigh the evidence and make inferences contrary to the jury's.  (*Casella, supra*, 157 Cal.App.4th at pp. 1159–1160.)  Here, the court concluded that plaintiff had recovered substantially from her injury after 18 months and that she did not reasonably mitigate her pain and suffering by undergoing the recommended surgery, completing physical therapy, or wearing the orthotic as prescribed.  While the jury made a conflicting inference, the

16

court's inferences were also reasonable.  (See *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 913 ["it is settled that when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable"].)  Thus, the court did not abuse its discretion by finding the jury's damages award to be excessive.

D.    *New Trial Judge*

Finally, plaintiff argues that if we affirm the order granting a partial new trial, we should order that a new trial judge be assigned pursuant to section 170.1, subdivision (c).  We reject this request.  The interests of justice do not require assignment to a new trial judge here.  (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 153; see also *Barboza v. West Coast Digital GSM, Inc.* (2009) 179 Cal.App.4th 540, 547 ["Plaintiffs have not shown that the interests of justice require disqualification of the judge who has presided over this case for the past five years, and whose order we are affirming on appeal"].)

17

## IV.   DISPOSITION

The order granting a motion for partial new trial is affirmed, and the matter is remanded for further proceedings. Defendant Studio S, Inc. is entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.

MOOR, J.